UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JAMES HODGE,

                     Plaintiff,

        - against -                    **07-CV-4084(TCP)(AKT)**

CITY OF LONG BEACH, EDWARD         **MEMORANDUM**
EATON, in his individual and             **AND ORDER**
official capacity, BOBBY PIAZZA, in
his individual and official capacity, and
ELAINE LEVY, as Executrix of the
Estate of ETHEL BODAH, deceased, in
her individual and official capacity,

                     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
PLATT, District Judge.

         Before the Court is defendant City of Long Beach's motion for

summary judgment pursuant to Federal Rule of Civil Procedure 56. For the

following reasons, defendants' motion is hereby **GRANTED**.

## I. BACKGROUND

**A.**      **Facts**

        **1.**      **Duties and Responsibilities of the Individual Defendants**

         As City Manager, defendant Edwin Eaton[1] ("Eaton"), was the

"chief executive officer"and was responsible for, *inter alia*, decisions concerning

City employees and the City operating budget. Def. 56.1 Stmt. ¶ 1. As Assistant

City Manager, Robert Piazza, s/h/a Bobby Piazza ("Piazza"), was responsible for

assisting the City Manager with various projects and assignments. *Id.* at ¶ 2.

---

1. The case's caption incorrectly states defendant Eaton's first name as "Edward."

Plaintiff James Hodge ("plaintiff") was employed by defendant City of Long Beach as an Animal Warden.

Defendants contend that as Assistant City Manager, Piazza did not have any supervisory role or oversight responsibilities concerning the operation of the Animal Shelter ("Shelter"). Def. 56.1 Stmt. ¶ 3. Plaintiff contends, however, that Piazza did have a supervisory role based on the following: (1) that Piazza was carbon copied on an document which he did not recall having seen before[2] (Dec. Brewington, Exh. A, Tr. Piazza 72:10-73:18); (2) defendant Eaton's testimony that Piazza, as his assistant, was charged with liaising with other Town departments, including Shelter, maintenance department highway department, etcetera and reporting to Eaton as well as Eaton's testimony that Piazza dealt with the "mundane dealings, day-to-day dealings" but that the two men saw one another daily, particularly if there was a substantial decision to be made (*id*. at Exh. B, Tr. Eaton 24:11-22; 25:4:16); and based on some electronic mailings ("email") between Piazza and defendant Bodah (*id*. at Exh. HH). Plt. 56.1 Ctr. Stmt. ¶ 3.

Defendant Ethel Bodah ("Bodah") was the Shelter's Humane Commissioner, an honorary position which entailed volunteering at the Shelter to care for the animals; as such, Bodah was not a supervisor and did not supervise plaintiff's operation of the Shelter. Def. 56.1 Stmt. ¶¶ 4, 5. Plaintiff contends that

---

2. The deposition testimony refers to and identifies the document by plaintiff's Bates Stamp numbers and plaintiff does not further identify it; thus, the document's exact content is unclear from the record.

Bodah's role was not solely to care for the animals; rather, Eaton gave Bodah purchasing authority on behalf of the Shelter sometime in 2007, which, according to plaintiff, was part of his duties. Plt. 56.1 Ctr. Stmt. ¶ 4. Furthermore, plaintiff offers various letters and correspondence authored by Bodah as proof that she supervised and oversaw operation of the Shelter. *Id.* at ¶ 5. Bodah died on August 7, 2008 at the age of 73. Def. 56.1 Stmt. ¶ 6.

### 2. Plaintiff's Employment Background with the City

Plaintiff was employed by the City in 1991 as a part-time laborer to clean cages and feed animals at the Shelter and, in 1998, was appointed to the position of Animal Control Officer by defendant Eaton. Def. 56.1 Stmt. ¶¶ 7, 8. While employed as an Animal Control Officer, plaintiff's work at the Shelter was marked by incidents of misconduct and poor performance including a situation where money collected by the Shelter for pet adoptions and licenses was unaccounted for and not turned into the City. *Id.* at ¶ 9. In lieu of formal disciplinary charges against plaintiff for mishandling City funds, the charges were resolved by a stipulation in which plaintiff admitted his negligence in keeping records at the Shelter.[3] *Id.* at ¶ 10. Plaintiff also abused his position as an Animal Control Officer when, in violation of the rules, he periodically housed two of his own dogs at the Shelter without charge. *Id.* at ¶ 11. Plaintiff left a dead animal in

---

3. In his Local Rule 56.1(b) Counter Statement, plaintiff only admits to the mishandling of a dead bird, not the mishandling of City funds. However, the Stipulation offered in support of defendants' 56.1(a) Statement, which is signed by James Hodge, states: "James Hodge admits that from July 1, 2000 through January of 2001 he was negligent in properly keeping and submitting of receipts at the Animal Shelter." Dec. Ciulla, Exh. K. Where a party's citation does not support the fact for which it is offered, the Court may disregard the material set forth therein.

the back of a City vehicle overnight, instead of promptly and properly disposing of the carcass. *Id.* at ¶ 12. Furthermore, volunteers at the Shelter observed plaintiff, after he captured a living possum with a snare pole, swinging the possum around and chasing people with it as set forth in a report authored by then Long Beach Assistant Police Commissioner John J. Laffey. *Id.* at ¶ 13. Plaintiff denies the accuracy of the report, which concluded that plaintiff had abused animals, because he was not interviewed prior to its completion. *Id.* at ¶ 14; Plt. 56.1 Ctr. Stmt. ¶¶ 13, 14.

### 3. Plaintiff's Appointment to the Permanent Position of Animal Warden

On or about April 30, 2004, and with the enthusiastic support of defendant Bodah, Former City Manager Glen Spiritis promoted plaintiff to Animal Warden on a provisional basis subject to his taking the civil service examination. Def. 56.1 Stmt. ¶ 15. On March 4, 2006 plaintiff took the civil service examination for the permanent position of Animal Warden; plaintiff shared the highest score of seventy-five (75) with Diane L. Vega and Luis Palacio scored a seventy (70). *Id.* at ¶¶ 16, 17. The Eligible List was certified by the Long Beach Municipal Civil Service Commission on April 19, 2006 and a canvassing of the candidates was completed on or about July 17, 2006. *Id.* at ¶¶ 18, 19.

When defendant Eaton became City Manager in July 2006, he met with plaintiff to discuss his history of misconduct and poor performance due to

plaintiff's request that his position be made permanent. *Id.* at ¶ 20. Thereafter and despite plaintiff's history of poor job performance, Eaton appointed plaintiff to Animal Warden and he was sworn in on August 7, 2006. *Id.* at ¶ 21. Plaintiff contends that the evidence cited by defendants supports the fact that Eaton was dissatisfied with plaintiff because he was in the process of suing defendants. Plt. 56.1 Ctr. Stmt. ¶ 20. Eaton testified, however, that although his initial reaction to promoting plaintiff was negative, he quickly put his feelings aside and appointed plaintiff. Dec. Brewington, Exh. B, Tr. Eaton 61:20-62:18. Plaintiff's post appointment salary and benefits remained the same as when he held the position on a provisional basis. Def. 56.1 Stmt. ¶ 22.

4. **Alteration of Plaintiff's Responsibilities and Use of City Equipment**

On or about May 5, 2006, then City Manager Laffey issued a Memorandum which advised plaintiff that no dog or cat in the Shelter was to be euthanized without his specific approval, due to ethical considerations and Humane Society concerns. *Id.* at ¶¶ 23, 24. Plaintiff contends that the policy was created due to pressure from Laffey's wife, a member of the Long Beach Humane Association. Plt. 56.1 Ctr. Stmt. ¶ 24.

Defendant Eaton delegated the responsibility for ordering Shelter food and supplies and for distributing Shelter mail to defendant Bodah due to plaintiff's failure to do so in a timely manner. Def. 56.1 Stmt. ¶ 25. While defendants contend that it was well documented that plaintiff failed to timely

order pet food for the Shelter, plaintiff contends that defendants cite to only a few instances of the Shelter running low, but not out of, wet animal food which was fed to the animals in addition to their dry food. *Id.* at ¶ 26; Plt. 56.1 Ctr. Stmt. ¶ 26. Eaton testified that in or around July 2006, plaintiff was unable to remember whether he had placed an order for pet food and after Bodah checked with the purchasing department, it was discovered that such an order had not been placed. Dec. Brewington, Exh. B, Tr. Eaton 99:17-101:3. Former Shelter employee Lori Mintz ("Mintz") testified that she spoke to someone about the pet food situation and that she called Bodah at home "several times" to see if she had any food. Mintz then changed her testimony from "several times" to a "few times." *Id.* at Exh. O, Tr. Mintz 59:18-25.

In or about September or October of 2006 and based upon inquiries by various members of the community concerning the City's receipt of donations to the Shelter and the return/refund of spay/neuter deposits to adopters, Eaton directed Bodah to search the Shelter facilities. Def. 56.1 Stmt. ¶ 28. Bodah found one donor check and spay/neuter paperwork in the desk as well as a check in the amount of $500.00 from one Al Kaufman in the Shelter's safe. *Id.* at ¶ 29. Plaintiff was responsible for delivering the checks and documentation to the City Clerk's and/or Comptroller's office and his failure to do so necessitated Bodah's search of the Shelter facilities. *Id.* at ¶ 30.

At all relevant times, the City had a general policy which precluded personal use of City-owned vehicles. *Id.* at ¶ 31. Plaintiff had unrestricted access

to a vehicles during work hours and in the case of an emergency, but was no longer permitted to take the vehicle home at the end of the work day because he had used the vehicle for personal reasons such as traveling to his job at a radio station. *Id.* at ¶ 32. Likewise, plaintiff was permitted to use the police radio during work hours for Shelter business, but was not permitted to take the radio home after work once Eaton became aware that plaintiff and other Shelter employees had used the radio frivolously and inappropriately. *Id.* at ¶ 33. Plaintiff notes that there were no written complaints or memoranda regarding this incident. Plt. 56.1 Ctr. Stmt.¶ 33.

On or about September 16, 2006 and subsequent to a City-wide audit of all agencies and departments, the New York State Comptroller's Office issued a Memorandum requiring all full time employees of the City to maintain daily sign-in sheets. *Id.* at ¶ 34. Plaintiff and all other Shelter employees or volunteers, therefore, were required to sign in and out at the Police Department. *Id.* at ¶ 35. Defendants' exhibit offered in support of this fact does not demonstrate that Shelter employees or volunteers are required to sign in and out at the Police Department. Plt. 56.1 Ctr. Stmt. ¶ 35.

### 5. Bodah's Alleged Use of a Racial Epithet

Plaintiff testified that former Shelter employee Lori Mintz advised him that defendant Bodah referred to him as a "nigger" in front of her and an unidentified Shelter volunteer although plaintiff never heard Bodah use the epithet in reference to him. Def. 56.1 Stmt. ¶¶ 36, 37; Dec. Ciulla, Exh. E, Tr. Hodge

-7-

272:7-21. According to plaintiff and Mintz, Bodah pushed plaintiff on one occasion at the Shelter. Def. 56.1 Stmt. ¶ 38. Plaintiff testified that Bodah wanted to force plaintiff out of the Shelter by pushing and "push-punching" him which lasted for a "second or two." Dec. Ciulla, Exh. E, Tr. Hodge 275:16-17; 276:15-24. After plaintiff complained of the alleged incidents and Mintz submitted a letter documenting Bodah's alleged epithet against plaintiff, Eaton testified that Laffey conducted an investigation which was inclusive as to what exactly transpired. Def. 56.1 Stmt. ¶ 39. Plaintiff contends that no investigation actually took place at the direction of Laffey based on defendant Piazza's testimony that he was unaware of an investigation or the results thereof. Plt. 56.1 Ctr. Stmt.¶ 39. In a discussion with Eaton, Bodah denied using any racial slurs against plaintiff and denied pushing him at the Shelter. Def. 56.1 Stmt. ¶ 40. After the investigation, plaintiff did not complain of any further incidents with Bodah. Def. 56.1 Stmt. ¶ 41. Plaintiff denies there were no complaints of further incidents with Bodah, but his contention is not supported by the evidence cited. Plt. 56.1 Ctr. Stmt. ¶ 41.

### 6. Piazza's Meeting with Plaintiff to Discuss Heating Problems at the Shelter

On or about December 8, 2006, Bodah contacted Piazza to advise him that there was no heat at the Shelter, which prompted Piazza to call Richard Schuh ("Schuh"), the City Building Inspector, to inspect the heating system. Def. 56.1 Stmt. ¶¶ 42, 43. According to Schuh, there was sufficient heat, but the doors

to the Shelter were left open which caused the problem.  *Id.* at ¶ 44.  On
December 11, 2006, the heating system was cleaned and new filters were
installed.  *Id.* at ¶ 45.  Defendants contend that on December 12, 2006, Piazza saw
plaintiff and Colleen Silvia ("Silvia"), President of the CSEA, walking through
the hallway at City Hall and had an impromptu meeting with them about the
heating issue.  *Id.* at ¶ 46.  They also contend that at that meeting, Piazza did not
refer to plaintiff's race or use any racial epithets.  *Id.* at ¶ 47.  Plaintiff correctly
notes that defendants' citations do not support the proffered statements.  Plt. 56.1
Ctr. Stmt. ¶¶ 46, 47.

### 7.    Section 75 Disciplinary Charges Against Plaintiff

On May 31, 2007, Eaton issued disciplinary charges against
plaintiff pursuant to Civil Service Law Section 75 as a result of, *inter alia,*
plaintiff's failure "[f]rom July 1, 2005 to April 30, 2007 . . .  To properly maintain
financial records at the Animal Shelter with respect to monies collected for
adoption, redemption, spay and neutering, euthanasia, and licensing services . . .
which resulted in a net loss of approximately $8,825.00."  Def. 56.1 Stmt. ¶ 50.
After a full hearing on all of the charges, in which plaintiff was represented by
counsel for the CSEA union, the Honorable Jack Mackston found plaintiff guilty
of the main charge described above as well as other charges of incompetence and
misconduct and recommended that plaintiff be terminated.[4]  Def. 56.1 Stmt. ¶ 51.

---

4.  Plaintiff has submitted an additional 383 facts, most of which either repeat facts previously set
forth or are immaterial and/or irrelevant to the claims and defendants named herein.  To the extent
plaintiff's additional facts are necessary to determine defendants' motion, they will be so noted.

### B.     Plaintiff's Complaint

Plaintiff alleges the following causes of action: (1) violation of 42 U.S.C. § 2000e-3 for engaging in discriminatory/retaliatory practices based on race, color and in retaliation for plaintiff's exposing defendant City's and its agents' unlawful discriminatory practices; (2) violation of 42 U.S.C. § 1981 based on plaintiff's race and color; (3) violation of 42 U.S.C. § 1983 (First and Fourteenth Amendments) and conspiracy in retaliation for opposing defendants' discrimination and for plaintiff's commencement of a lawsuit against the City, its agents and employees; (4) violation of 42 U.S.C. § 1983 (municipal violations) by defendants City, Eaton, Piazza and Bodah in that they, while acting under the color of state law, deprived plaintiff of his rights when he was subjected to racial epithets and was assaulted; and (5) violation of New York State Executive Law § 296 for discrimination/retaliation based on plaintiff's race and color.  Plaintiff also seeks attorney's fees and costs as well as a declaratory judgment stating that defendants wilfully violated plaintiff's federal and state law rights.

## II.  DISCUSSION

### A.     Legal Standard for Summary Judgment

A motion for summary judgment may not be granted unless a court determines that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting FRCP 56(c)). "Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Williams v. R.H. Donnelly Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Id.*; *Castle Rock Entertainment, Inc. v. Carol Publishing Group*, 150 F.3d 132, 137 (2d Cir. 1998). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the [specific] pleadings, and 'designating specific facts showing that there is a genuine issue for trial.' " *Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If there is any evidence in the record from which a reasonable inference may be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

There is a "genuine" issue of fact only if the "evidence [presented] is such that a reasonable jury could return a verdict for the nonmoving party." *Giodano v. City of New York*, 274 F.3d 740, 746-47 (2d Cir. 2001). Plaintiff's evidence may not amount to a mischaracterization of facts because "attempts to twist the record do not create a genuine issue of material fact for a jury." *Kim v. Son*, No. 05-CV-1262, 2007 WL 1989473, at *6 (E.D.N.Y. July 9, 2007). Therefore, "where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." *Holz v. Rockefeller &*

*Co.,* 258 F.3d 62, 73 (2d Cir. 2001). Also, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Finally, Federal Rule of Civil Procedure 56(e)(1) mandates that all facts under consideration in a motion for summary judgment be directly supported by proof in admissible form.

**B.     Defendants' Motion for Summary Judgment**

        **1.     Plaintiff's 42 U.S.C. § 2000e-3 Claims**

                *a.     Retaliation Claim*

Title 42 U.S.C. § 2000e-3(a) ("Title VII") provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." "The *McDonnell Douglas [Corp. v. Green*, 411 U.S. 792, 802 (1973)] burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII." *Terry v. Ashcroft*, 336 F.3d 128, 140 (2d Cir. 2003). *See Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (noting that allocation of the burden of proof in retaliation cases follows burden shifting approach enunciated in *McDonnell Douglas*); *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (reciting burden shifting approach in Title VII retaliation cases).

To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) he participated in an activity protected by Title VII; (2) the employer was aware of his participation in the protected activity; (3) thereafter, his employer subjected him to a materially adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action.[5] *Kaytor v. Electric Boat Corp*., 609 F.3d 537, 552 (2d Cir. 2010). *See, e.g.*, *Cifra,* 252 F.3d at 216; *Quinn v. Green Tree Credit Corp*., 159 F.3d 759, 769 (2d Cir. 1998). "If the plaintiff meets this burden and the defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra*, 252 F.3d at 216. *See Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 443 (2d Cir. 1999); *Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir. 1998).

With regard to the first prong, whether plaintiff participated in an activity protected by Title VII, plaintiff, while employed by the Shelter, filed a lawsuit on November 4, 2002 against the City of Long Beach, then-Director of Operations for the City, Eugene Cammarato, City Manager (and defendant herein) Edwin Eaton and then-Animal Commissioner, Lawrence Wallace, in their individual and official capacities, alleging that he was discriminated against

---

5. The analysis utilized by defendants is applicable to 42 U.S.C. § 2000e-2(1)(a) which forbids discrimination in the hiring or promoting of an individual. Plaintiff's complaint contains workplace retaliation and hostile work environment claims which fall within 42 U.S.C. § 2000e-3.

because of, *inter alia*, his race.[6]  The filing of a lawsuit alleging employment

discrimination on the basis of race is an activity protected by Title VII and falls

within the ambit of 42 U.S.C. § 2000e-3(a).

The next inquiry is whether the employer was aware of plaintiff's

participation in the protected activity.  Given that plaintiff is suing the City of

Long Beach, City Manager Eaton and the Humane Commissioner (albeit a

different Commissioner from plaintiff's suit filed in 2002), it is fair to presume

that plaintiff's employer was aware of his participation in activity protected by

Title VII.

Third, to establish a prima facie retaliation case, a plaintiff must

demonstrate that he suffered a materially adverse employment action.  An adverse

employment action is defined as a materially adverse change "in the terms and

conditions of employment."  *Sanders v. New York City Human Resources Admin.,*

361 F.3d 749, 755 (2d Cir. 2004).  *See Richardson,* 180 F.3d at 446 ("[A] plaintiff

may suffer an 'adverse employment action' if she endures a 'materially adverse

change in the terms and conditions of employment.' ") (quoting *Torres v. Pisano*,

116 F.3d 625, 640 (2d Cir. 1997)).  A materially adverse change in working

conditions must be "more disruptive than a mere inconvenience or an alteration of

job responsibilities."  *Terry*, 336 F.3d at 138.  "Examples of such a change

---

6.  This case was filed in the District Court for the Eastern District of New York under caption
number 02-CV-5851.  Defendants moved for and were granted summary judgment by Order dated
April 14, 2010 which plaintiff appealed by notice dated May 4, 2010.  That appeal was not
decided as of the date of this Order.

include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.' " *Sanders*, 361 F.3d at 755 (quoting *Terry*, 336 F.3d at 138). "A plaintiff can demonstrate an adverse employment action by showing 'that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Stuart v. Peake*, No. 08-CV-1350, 2010 WL 3338913, at *5 (N.D.N.Y. August 24, 2010) (quoting *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006)). With regard to retaliation claims, the Supreme Court has held that the anti-retaliation law "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

Plaintiff argues that the following constitute materially adverse employment actions. First, defendants' delay in appointing plaintiff to a permanent position as Animal Warden for four months after the Civil Service Eligibility List was established despite the fact that plaintiff had functioned as a provisional Animal Warden for two (2) years, which, plaintiff contends, directly resulted from plaintiff's 2002 filing of the lawsuit discussed above. Plt. Mem. in

Opp. at p. 9; Plt. 56.1 Stmt. ¶¶ 283-285.[7]  Among other things, plaintiff claims

that his experience of waiting some months prior to being appointed was unusual

in that the City "customarily appointed people who passed the civil service exam

and who already provisionally held the position they sought right away."  Plt. 56.1

Stmt. ¶ 94.  Plaintiff testified that defendant Eaton did not appoint him for the

four month period because he is African-American.  Dec. Brewington, Exh. C, Tr.

Hodges 171:22-172-2.  As evidence of this alleged fact, plaintiff cites to his

deposition testimony that "other people that passed the civil service tests, if they

are in positions, they receive . . . notice right away."  *Id.* at 149:19-150:6.  When

asked by defendants' counsel to identify specific individuals, plaintiff responded

that he did not have "their names exactly right now" but that "Kiera Cohen

[Secretary for the Civil Service Commission] would know" or that "maybe

Ronnie Myles would know."  *Id.* at 172:23-173:6.  At the time the instant motion

was filed, plaintiff had still not identified any such individuals or submitted

documentation as proof of his claim.  Nor, it appears from the record, was Kiera

Cohen or anyone else with such knowledge deposed and no affidavits from these

individuals were submitted.  Such evidence is paramount for plaintiff's prima

facie case considering the hearsay character of the proof offered, *i.e.*, plaintiff's

testimony that he "was told that if he were white he would have been appointed

immediately by the Civil Service Commission Secretary, Kiera Cohen."  Plt. 56.1

_____

7.  Plaintiff's additional facts are cited as "Plt. 56.1 Stmt."

Stmt. ¶ 103.  Plaintiff also testified that Kiera Cohen told him "that the delay in his appointment was because he had prior/pending race discrimination cases filed against Defendant City" which name as defendants Eaton and Laffey.  *Id.* at ¶ 105. Both statements go to the heart of plaintiff's case but are inadmissible to prove his retaliation claim.

Moreover, as plaintiff also testified, he understood that the City Manager had the discretion to appoint one of the three top scoring individuals on the Civil Service Exam.  Dec. Brewington, Exh. C, Tr. Hodge 128:19-23.  Eaton was authorized pursuant to New York's Civil Service Law § 61(1) to appoint plaintiff, Diane Vega or Louis Palazzo to the Animal Warden position despite the fact that plaintiff held it on a provisional basis.  *See Francis v. City of New York*, No. 06-CV-80038, 2007 WL 1175695, at *1 (N.Y. Sup. Ct. April 20, 2007) ("Moreover, Civil Service Law § 61(1) expressly permits an agency to select any one of the three persons standing highest on the eligible list.").  Consequently, plaintiff had no right to the appointment in the first instance.  *See Andriola v. Ortiz*, 624 N.E.2d 667, 669 (N.Y. 1993) ("Consistent with our adherence to the historical policy upon which Civil Service Law § 61 is based, we have held that a person successfully passing a competitive Civil Service examination does *not* acquire any "legally protectable interest" in an appointment to the position for which the examination was given, nor thereby gain a vested right to appointment to the position.") (internal citations omitted).  Thus, the record does not demonstrate that any "delay" in appointing plaintiff was done with a retaliatory

purpose, particularly given that Eaton, well aware of plaintiff's 2002 lawsuit, could, with impunity, have appointed Vega or Palazzo.

In addition and as defendants argue, any alleged delay did not constitute an adverse employment action because plaintiff, who already held the Animal Warden position on a provisional basis, maintained the same salary and benefits as he had before Eaton appointed him on a permanent basis. *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) ("[T]here is no evidence that shows that the delay in reassignment . . . was an adverse employment action. Appellant does not allege that appellee denied him an available transfer, that appellee failed to pay his salary during the interim period, or that the delay in any way harmed his career.").

Finally, Eaton, who is also a defendant in plaintiff's 2002 lawsuit and was well aware of plaintiff's race, appointed plaintiff approximately four (4) weeks after he reassumed his position as City Manager on July 5, 2006. Plaintiff's contention that Eaton waited four (4) months to appoint plaintiff is, therefore, false. Mem. in Opp. at p. 9; Dec. Brewington, Exh. C, Tr. Hodge 144:11-18. Given all of the foregoing, any delay in appointing plaintiff to the Animal Warden position does not, as a matter of law, amount to a materially adverse employment action resulting from a retaliatory animus on the part of defendants.

Next, plaintiff argues that he suffered adverse employment actions when defendants diminished his responsibilities, privileges and job functions by

prohibiting plaintiff from picking up the Shelter's mail, typically addressed to the Animal Shelter or Animal Warden, from City Hall; prohibiting plaintiff from purchasing supplies for the Shelter; prohibiting plaintiff from preparing the proposed annual budget for the Shelter; stripping plaintiff of the authority to determine which cats and dogs should be euthanized; prohibiting plaintiff from taking a Shelter vehicle and police radio home after his shift; diminishing plaintiff's supervisory role by requiring all Shelter staff to sign in and out at the police department; granting Bodah the power to fire paid Shelter employees and hire new employees without consulting plaintiff; and excluding plaintiff from drafting and offering input to new policies and procedures for the Shelter and granting such authority to Bodah.

Courts have held that "simply being assigned undesirable work duties and unfavorable work schedules are insufficient to establish adverse employment action[s], since they do not have a material impact on the terms and conditions of plaintiff's employment." *Figueroa v. New York City Health and Hospitals Corp.*, No. 03-CV-9589, 2007 WL 2274253, at *4 (S.D.N.Y. August 7, 2007). Similarly, " 'being yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions . . . because they [do] not have a material impact on the terms and conditions of plaintiff's employment.' " *Smalls v. Allstate Ins. Co.*, 396 F.Supp.2d 364, 371 (S.D.N.Y. 2005) (quoting *Lee v. New York State Dept. of Health*, No. 98-CV-5712, 2001 WL 34031217, at *16 (S.D.N.Y. April 23, 2001)).

In this case, plaintiff experienced a diminution of some of his duties but still received the same pay and benefits and remained in his position as Animal Warden, *i.e.*, there was no material impact on the terms and conditions of plaintiff's employment. He retained his position as the City's Animal Warden and received the same pay. In addition, plaintiff admitted at his deposition that he was permitted to use the department vehicle during his working hours without limitation (Dec. Brewington, Exh. C, Tr. Hodge 243:4-17) and that he was permitted to retain the vehicle's key during non-working hours (*id*. at 239:12-16). Nor could plaintiff recall any specific instances when his not being able to drive a vehicle home at night prevented him from carrying out his duties. *Id.* at 243:25-244:25. Furthermore, pursuant to a New York State Comptroller audit performed on the City of Long Beach, all full-time employees were required to sign-in on a daily basis. Dec. Ciulla, Exh. O. Given that the Shelter fell under the auspices of the Long Beach Police Department, all Shelter employees, without regard to their race, were required to sign in and out through that department. Reply Mem. at p. 2. Plaintiff also testified although he rarely did so, he would delegate the job of picking up the mail "from time to time" and that he believed he was advised that he was no longer to pick up the mail *prior* to the time he was sworn in as Animal Warden by defendant Eaton. Dec. Brewington, Exh. C., Tr. Hodge 198:19-199:3; 200:10-22. Additionally, the decision to give the authority to euthanize animals to Laffey was made in or around May 2006, prior to the time that defendant Eaton reassumed his position as City Manager (*id*. at Exh. B, Tr. Eaton 81:11-82:15)

which is also prior to the time that plaintiff was sworn in as Animal Warden.

Thus, Eaton did not "strip" plaintiff of such authority.  In any event, a

municipality may change its policies without the approval of its employees as long

as such changes are not fueled by a discriminatory purpose.  Plaintiff has not,

therefore, established by credible evidence that any reductions in his duties were

the result of his race or in retaliation for the lawsuit filed in 2002.

In any event, even assuming *arguendo* that the foregoing amounted

to material changes in the terms and conditions of plaintiff's employment, the City

has demonstrated legitimate reasons for lessening plaintiff's responsibilities.

Eaton testified that it came to his attention that plaintiff used the City owned

vehicle after hours to travel to his radio show (Dec. Brewington, Exh. B, Tr.

Eaton 92:7-13) and that other department heads had lost use of their vehicles for

non-job related use as well (*id*. at 92:14-94:2).  With regard to restricting

plaintiff's (and all Shelter employees') off-hours use of the police radio, Eaton

testified that "it was a request of the police department, because animal control

people were using the police frequency, an emergency frequency, frivolously, just

making too much use of it but they weren't emergency calls or anything of that

nature, and the police were annoyed at it, and they wanted it taken away from

them for off hours." *Id.* at 147:16-24.  Eaton also testified that he had discussed

with plaintiff the fact that defendant Bodah would be handling the purchasing of

food for the Shelter and that plaintiff was well aware of same before he was

appointed by Eaton in August 2006. *Id.* at 102:17-103:9.  Eaton made the

decision to give purchasing authority to Bodah after she advised him that plaintiff had not submitted a requisition for animal food; Eaton testified that when he asked plaintiff whether he had ordered the food, plaintiff could not recall and, in fact, he had not. *Id.* at 99:17-101:3. " 'The defendant's burden of production . . . is not a demanding one; [it] need only offer such an explanation for the employment decision. Although the burden of production shifts to the defendant, the ultimate burden of persuasion remains always with the plaintiff.' " *Lee*, 2001 WL 34031217, at *10 (quoting *Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999)). Nor should the Court second guess the business decisions of an employer, even if they seem unfair or unjust, as long as they are not made with a discriminatory purpose. *Cavuoto v. Oxford Health Plans, Inc.*, No. 99-CV-446, 2001 WL 789316, at *4 (D. Conn. June 13, 2001).

　　　　Given all of the foregoing, plaintiff has not carried his burden of establishing a prima facie case that defendants retaliated against him for filing the 2002 lawsuit because he has not demonstrated that defendants' actions would have dissuaded a reasonable employee from filing a discrimination charge given that plaintiff did not suffer an adverse employment action. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (holding that the "proper formulation requires a retaliation plaintiff to show that the challenged action well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' ") (quoting *Rochon v. Gonzales*, 438 F.3d 121, 1219 (D.C. Cir. 2006)); *Laudadio v. Johanns*, 677 F.Supp.2d 590, 611 (E.D.N.Y. 2010) (same)

(quoting *White*, 548 U.S. at 68.)  Plaintiff is also unable to demonstrate a causal

connection between his protected activities and the alleged adverse actions.

Therefore, a rational fact-finder could not find for plaintiff on his Title VII

retaliation claim.  In addition, defendants have set forth valid non-pretextural and

non-discriminatory reasons for the decisions made with respect to plaintiff's

duties and use of Shelter equipment, which have not been refuted by plaintiff

pursuant to the burden shifting framework set forth in *McDonnell Douglas.*

Finally, as defendants correctly note, Title VII does not encompass

individual liability.  *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir.

2003) (noting that individual supervisors are not liable under Title VII); *Wrighten*

*v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (same). Thus, defendants Eaton,

Piazza and Bodah are not individually liable to plaintiff.  Accordingly,

defendants' motion for summary judgment on this claim is hereby granted.

### b.     *Hostile Work Environment Claim*

"Title VII affords employees the right to work in an environment

free from discriminatory intimidation, ridicule, and insult."  *Meritor Sav. Bank v.*

*Vinson*, 477 U.S. 57, 65 (1986).  "When the workplace is permeated with

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive

working environment, Title VII is violated."  *Harris v. Forklift Systems, Inc.*, 510

U.S. 17, 21 (1993) (internal citation and quotations marks omitted).  To withstand

a motion for summary judgment, a plaintiff must demonstrate that the workplace

was sufficiently rife with such conduct and that he subjectively thought the workplace was abusive. *Aulicino v. New York City Dept. of Homeless Services*, 580 F.3d 73, 82 & n.8 (2d Cir. 2009). A plaintiff alleging a hostile work environment must demonstrate: " '(1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.' " *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996)).

"In *Harris,* the Supreme Court established a non-exclusive list of factors relevant in determining whether a given workplace is permeated with discrimination so "severe or pervasive" as to support a Title VII claim." *Richardson v. New York State Dep't of Corr. Serv*., 180 F.3d 426, 437 (2d Cir. 1999) (citing *Harris*, 510 U.S. at 23). These include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance"; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Id.* (citing *Harris*, 510 U.S. at 23).

The " 'mere utterance of an . . . epithet which engenders offensive feelings in a employee,' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 67). Rather, for racist comments, slurs and jokes to amount to a hostile work

environment, there must be "more than a few isolated incidents of racial enmity." *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1986). " '[I]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.' " *Schwapp*, 118 F.3d at 110 (quoting *Bolden v. PRC, Inc*., 43 F.3d 545, 551 (10th Cir. 1994)). Accordingly, whether "racial slurs constitute a hostile work environment typically depends upon 'the quantity, frequency, and severity' of those slurs" which should be considered on a cumulative basis. *Id.* at 110-11 (quoting *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir. 1994)).

" '[W]hen the harassment is attributable to a coworker, rather than a supervisor, . . . the employer will be held liable only for its own negligence.' " *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009 (quoting *Distasio v. Perkin Elmer Corp*., 157 F.3d 55, 63 (2d Cir. 1998)). An employer will be liable for imputed conduct where it fails " 'to provide a reasonable avenue for complaint' " or " 'it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.' " *Id.* (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)).

In support of his hostile work environment claim, plaintiff alleges that one Leery Wade of the Civil Service Commission told him that former City Manager Laffey attempted to discredit and tarnish plaintiff's reputation by telling one of his "white friends" that Wade had helped plaintiff cheat on the Civil Service Test. Mem. in Opp. at p. 16; Plt. 56.1 Stmt. ¶ 104. The only evidence offered in support of this fact is plaintiff's deposition testimony which merely

states what he was allegedly told by Wade, which is clearly inadmissible hearsay and will not be considered by the Court.

Next, plaintiff alleges that defendant Bodah was informed about Laffey's statement and used the accusation to taunt plaintiff and to repeat it numerous times to and in front of Shelter workers as well as stating that plaintiff was "dumb and illiterate." Plaintiff offers a typewritten document authored and signed by Shelter employee Mintz and addressed to plaintiff, which, with regard to Bodah, states:

> I told her that I'm sick of hearing all the negative things you say about everybody especially James. Saying that "this place isn't big enough. It's me or that N*****R goes" and yes in quotes. Those were her exact words and I've heard her say this many times. I have seen her go through James [sic] desk and make a photo copy of her [sic] paycheck. She also says that James Hodge can't read of [sic] write. To finish up the incident I had with Ethel that day, James came to the shelter and I told him what happened and he asked Ethel to leave the shelter. Ethel attacks of comments, complaints about me appear to be more based on her personality problems as illustrated by many post [sic] conflicts with other workers here at the shelter.

Dec. Brewington, Exh. U. The bottom of this document states that it was received by James Hodge, Animal Warden, on May 17, 2006.

Plaintiff also submits another document authored by Mintz which claims that on April 27, 2006 and soon after plaintiff arrived at the Shelter to discuss some things with Mintz, Bodah interrupted their conversation by "yelling and screaming profanity at James"; "proceeded to call James a cat killer and

animal hater"; [a]s Ethel was yelling . . . she was also poking her finger into James [sic] arm which turned from a finger poke to a fist punch."  Also according to Mintz, after plaintiff walked away from Bodah, she "came yelling back again" at plaintiff and started "to push him through the door and . . . started to open and close the door on him several times."  *Id.* at Exh. V.

With regard to that incident, plaintiff testified that Bodah "came pushing me on my shoulders, bumping me, saying get out of here, you failed the test.  Just saying a lot of different things that I don't remember all of the words right now, and you cheated on the test, you are dumb, and just saying a lot of different things."  *Id.* at Exh. C, Tr. Hodge 273:19-25.  Plaintiff also testified that Bodah continued to push him "[f]or a second or two, just trying to get me out of the shelter, and just really being loud and in my face and stuff."  *Id.* at 276:15-17.

Finally, plaintiff claims that Bodah was permitted by defendant City to repeatedly refer to him as a "nigger" in front of plaintiff's staff at the Shelter and physically assault plaintiff without any repercussions or effective investigations.

Mintz testified that she recalled hearing Bodah refer to Hodge as a "stupid nigger" sometime in 2004 even though she could not identify a specific date or month nor could she recall when she told plaintiff what Bodah had called him although she knew it was sometime after 2004.  Dec. Brewington, Exh. O, Tr. Mintz 48:21-22; 49:23-50:4; 51:20-52:5.  She also testified that Bodah, behind

plaintiff's back, referred to him by the name in conversations with Mintz "[i]n between five to ten" times over what appears to be a two (2) year period. *Id.* at 185:7-20.

Plaintiff testified that Bodah never called him a "nigger" to his face (*id*. at Exh. C, Tr. Hodge 272:7-17; 273:2-5) and that her reference to plaintiff "could have been [in] 2006, 2005" although he was unsure. *Id.* at 271:21-272:6. Plaintiff also testified that he found out about the name calling from Mintz and an unidentified woman at which time he immediately brought the incident to the attention of Lieutenant Sharpe and the City Manager. *Id.* at 272:17-25. When asked whether he knew of any instance where Bodah used the epithet prior to the time she put her hands on him in April 2006, plaintiff stated that "[a]nother volunteer heard her say something about niggers" but plaintiff was unable to identify the volunteer or when he was first advised about the second event. *Id.* at 305:10-21.

In the first instance, the Court finds that Bodah was not plaintiff's supervisor despite the fact that she may have been given some of his responsibilities. Indeed, it was Eaton who directed Bodah to search plaintiff's desk (and the Shelter in its entirety) in an attempt to locate missing shelter donations and funds. Def. 56.1 Stmt. ¶ 28. If Bodah was plaintiff's supervisor, she could have done so on her own. Moreover, the search of a co-worker's desk does not create a hostile work environment. *See Rose v. Panolam Industries Intern. Inc.*, 301 F.Supp.2d 239, 246 (D. Conn. 2004) (desk search by co-worker

deemed insufficient as proof of hostile work environment). In addition, there is no credible evidence that Bodah had the authority to hire or discharge plaintiff, affect his pay and benefits or reassign him to a significantly different position, all of which are hallmarks of supervisory authority. " 'Supervisor' is a legal term of art for Title VII purposes, and an employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context." *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004) (citing *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002)). "A supervisor is someone with the power to *directly* affect the terms and conditions of the plaintiff's employment." *Id.* That Bodah was not a supervisor is also demonstrated by Mintz's observation that Bodah had conflicts[8] with co-worker Mintz as well as other co-workers in addition to plaintiff.

Furthermore, noticeably absent from the bumping and shoving workplace incident cited by plaintiff is any evidence of racial hostility. Rather, the incident evinces a contentious, and contemptuous, working relationship between Bodah and plaintiff. In addition, by plaintiff's own testimony, the incident was very brief. Nor, given the lack of discriminatory animus during the incident, does it rise to a single severe incident for the purposes of Title VII. *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) ("In short, a plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous

---

8. There is no indication in the record that these conflicts had any discriminatory bases.

and concerted' to have altered the conditions of her working environment.' ")
(quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)).

The only credible allegation of a discriminatory hostile work
environment in the record before the Court is Bodah referring to plaintiff as a
"nigger."  With regard to the two reports of Bodah referring to plaintiff as a
"nigger," however, plaintiff testified that Bodah never actually directed the epithet
at him.  In any event, these two instances, the timeline of which plaintiff is unsure,
do not establish a workplace "permeated with discriminatory intimidation" for
Title VII purposes, even if she had uttered it in his presence.  *See Schwapp*, 118
F.3d at 112 (holding that ten (10) substantiated racially hostile incidents during
plaintiff's twenty (20) month tenure at his employment precluded summary
judgment on his hostile work environment claim); *Snell v. Suffolk County*, 782
F.2d 1094, 1103 (2d Cir. 1986) ("To establish a hostile atmosphere, however,
plaintiffs must prove more than a few isolated incidents of racial enmity.") (citing
*Gilbert v. City of Little Rock, Ark.*, 722 F.2d 1390, 1394 (8th Cir. 1983); *EEOC v.
Murphy Motor Freight Lines, Inc.*, 488 F.Supp. 381, 384 (D.C. Minn. 1980));
*Brown v. Middaugh*, 41 F.Supp.2d 172, 188 (N.D.N.Y. 1999) (holding that
references to plaintiff as a "nigger," "lazy nigger," "piece of shit nigger" and
"good for nothing nigger," although despicable, odious and offensive, did not
"constitute discriminatory behavior that is sufficiently severe or pervasive such
that plaintiff's hostile work environment claim can survive summary judgment").

Even if Bodah's conduct is deemed unrefined, uncivil or, indeed,

tortious, Title VII simply "does not set forth a general civility code for the American workplace." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  Consequently, the Court concludes that the foregoing incidents do not amount to a hostile work environment because they do not demonstrate a "general atmosphere permeated with racial intolerance." *Gadsden v. Bernstein Litowitz Berger & Grossman*, 323 Fed.App'x 59, 60 (2d Cir. 2009).

Accordingly, the Court does not reach the question of whether Bodah's conduct should be imputed to the City and whether the City had an adequate policy in place for dealing with hostile work environments or whether it failed to take action despite having knowledge of such an environment.  For all of the foregoing reasons, defendants' motion for summary judgment on plaintiff's hostile work environment claim is hereby granted.

### 2.      Title 42 U.S.C. § 1981 Claim

Title 42 U.S.C. § 1981(a) provides:

Statement of equal rights

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Section 1981 "provides a cause of action for race-based employment discrimination based on a hostile work environment." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (citing *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987)) (holding that the "cause of action for a hostile working environment has also been recognized under § 1981"). A court analyzing a § 1981 claim applies the same standards as those in Title VII cases. *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 347 n.2 (7th Cir. 1999). *See Taitt v. Chemical Bank*, 849 F.2d 775, 777 (2d Cir. 1988) (citing *Choudhury v. Polytechnic Institute of New York*, 735 F.2d 38, 44 (2d Cir. 1984)) ("The elements required to make out a claim of retaliatory discharge under 42 U.S.C. § 1981 are the same as those required to make out such a claim under Title VII.").

Having previously applied the *McDonnell Douglas* burden shifting analysis to plaintiff's Title VII retaliation claims and that analysis being applicable to plaintiff's 42 U.S.C. § 1981 claim, defendants' motion for summary judgment as to the § 1981 claim is hereby granted.

### 3. Title 42 U.S.C. § 1983 Claims

Pursuant to 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"By the plain terms of § 1983, two-and only two-allegations are

required in order to state a cause of action under that statute.  First, the plaintiff must allege that some person has deprived him of a federal right.  Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law."  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citing *Monroe v. Pape*, 365 U.S. 167, 171 (1961)).  Furthermore, it is well settled that " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' "  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)).  A supervisor may be held personally liable if he or she directly participates in the wrong, fails to remedy a known wrong, creates a policy or custom with unconstitutional practices or is grossly negligent in managing subordinates who engage in unconstitutional conduct.  *Id.* (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir. 1986)).

As plaintiff notes, defendant Eaton was the City Manager, defendant Piazza was the Assistant City Manager and Bodah was the Humane Commissioner.  Defendant City is a municipality.  Accordingly, the state action requirement is fulfilled.

### a.     *First Amendment Claim*

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or

abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and petition the Government for a redress of grievances."  U.S. Const. amend. I.  To state a First Amendment retaliation claim, a plaintiff must demonstrate that "(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, 'so that it can be said that his speech was a motivating factor in the determination.' "  *Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003) (quoting *Morris v. Lindau*, 196 F.3d 102, 109-10 (2d Cir. 1999)).  "Public employee speech is protected from employer retaliation under the First Amendment only where 'the employee spoke as a citizen on a matter of public concern.' "  *Storman v. Klein*, 08-CV-4894, 2010 WL 3959817, at *2 (2d Cir. Oct. 12, 2010) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  However, "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."  *Connick v. Myers*, 461 U.S. 138, 146 (1983).

　　　　If plaintiff establishes a prima facie retaliation claim, the government may avoid liability by establishing "(1) by a preponderance of the evidence that it would have taken the same adverse action regardless of the protected speech, or (2) show that the plaintiff's expression was likely to disrupt the government's activities, and that the likely disruption was sufficient to

outweigh the value of the plaintiff's First Amendment expression." *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) (citing *Mandell*, 316 F.3d at 382-83). *See United States v. National Treasury Employees Union*, 513 U.S. 454, 465 (1995) ("If, however, the speech does involve a matter of public concern, the government bears the burden of justifying its adverse employment action.") (citing *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). Announced by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and commonly referred to as the "*Pickering* balancing test," it is a "question of law for the court to decide." *Id.* (citing *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001)).

### Public Concern Requirement

As an initial matter, the Court must determine whether plaintiff's speech touched upon a matter of public concern. A matter of "public concern" is 'something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication.' " *Piscottano v. Murphy*, 511 F.3d 247, 270 (2d Cir. 2007) (citing *Connick*, 461 U.S. at 150 n.10). *See Morris*, 196 F.3d at 110 (holding that speech on "any matter of political, social, or other concern to the community is protected by the First Amendment").

The question of whether a government "employee's expressive activity is speech on a matter of public concern is an issue of law for the court." *Id.* (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004)). *See Lewis v.*

*Cowen*, 165 F.3d 154, 163 (2d Cir. 1999) ("Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record.") (citing *Connick*, 461 U.S. at 147-48 & n.7).  In its public employee speech jurisprudence, the Supreme Court has "acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (citing *Pickering* and noting that it rejected the school administrators' attempts to limit teachers from engaging in public debate). In *Pickering*, the Court remarked that the public employees at issue, *i.e.*, teachers, were "the members of a community most likely to have informed and definite opinions" about school expenditures. 91 U.S. at 572.  In *Garcetti*, the Court stated that its holding in *Pickering* "acknowledged the necessity for informed, vibrant dialogue in a democratic society."  547 U.S. at 419.  Also in *Garcetti*, the Court cited to *City of San Diego v. Roe* for the proposition that " '[w]ere [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.' " *Garcetti*, 547 U.S. at 420 (quoting *City of San Diego*, 543 U.S. 77, 82 (2004) (citations omitted).  Moreover, the "First Amendment protects some expressions related to the speaker's job." *Id. See Pickering,* 391 U.S. at 573 (holding that the "interest of the school

administration in limiting teachers' opportunities to contribute to public debate"

with respect to raising school revenue "is not significantly greater than its interest

in limiting a similar contribution by any member of the general public"); *Givhan*

*v. Western Line Consol. School District*, 439 U.S. 410, 414 (1979) (remanding

case for factual determination of free speech retaliation claim where teacher was

terminated for privately expressing her complaints about school policies to

principal).  "The heart of the matter is whether the employee's speech was

'calculated to redress personal grievances or whether it had a broader public

purpose.' " *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008)

(quoting *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 2008)).

Plaintiff argues that defendants retaliated against him for

exercising his First Amendment rights in the following ways: (1) filing a

complaint with the EEOC/NYSDHR; (2) filing two previous pending lawsuits

against the City alleging discrimination and retaliation; (3) continually raising

issues with Long Beach City council members, elected officials and people in the

community about the City's failure to hire people of color to fill a multitude of

positions within the City's numerous departments (Plt. 56.1 Stmt. ¶ 98); and (4)

for further exercising free speech by continually raising issues of employment

discrimination in terms, conditions and benefits for African-American employees

included but not limited to the Sanitation Department and childcare workers at the

Martin Luther King Community Center during public City Council meetings and

with City Council members commencing in 2000.  Plt. 56.1 Stmt. ¶¶ 95-96.

In the first instance, plaintiff's contentions that he raised issues before the City Council, elected officials and locals, which may have included valid observations and concerns about the City's purported discriminatory practices, are too vague to fulfill the public concern requirement as the deposition testimony cited by plaintiff in his Local Rule 56.1 Statement demonstrates.  When asked to give specific examples of discrimination against other people which plaintiff opposed, he responded:

> Discrimination in hiring practices may have been for the City, where there may have been people that have been working four, five, six, seven years, that didn't receive benefits.  Same people came on in two years and received benefits, civil service jobs, could be my vocalness for the community on different community projects, be it supporting different endeavors that the community may take up.

Dec. Brewington, Exh. C, Tr. Hodge 152:25-153:10.  With regard to vocalizing discrimination against people other than himself, plaintiff testified:

> Other people would be me speaking out at council meetings for different things that have happened to different individuals in the community, be it the sanitation workers.

*Id.* at 154:13-16

> Specific examples, asking them to hire child care workers, may have been in city council meetings or outside of council meetings, hiring sanitation workers, hourly employees that are working 40 hours of more, but don't have any benefits, minorities that have been working some over seven, eight years and to their counterparts, white employees, some of them have–some come in and worked one or two years and received benefits and civil service jobs and I made that vocal that it's just not right.

*Id.* at 155:7-18.  The following exchange is also pertinent to the public concern

requirement:

> Q.    When did you voice your opposition to that [racial] discrimination?
>
> A.    I'm not sure.  Every year I do.
>
> Q.    Every year?
>
> A.    And I have also spoke about that in several different civil council meetings. . . .
>
> Q.    Who did you voice your concerns to?
>
> A.    I always spoke to council members, always spoke to different city officials and administration.
>
> Q.    Which council members did you speak to in 2002?
>
> A.    I don't exactly remember.

*Id.* at :164:4-9;16-23.  When asked whether he had spoken to defendant Eaton

about his concerns of racial discrimination directed at child care and sanitation

workers, plaintiff testified: "I think I have spoken to him about it in council

meetings.  I am not exactly sure when."  *Id.* at 165:18-22.

Furthermore, plaintiff offers no additional evidence of the exact

nature of his discussions, including specific details as to content except for vague

references to speaking with council members about, for the most part, unidentified

individuals who were also employed by the City. There is not even a claim that

plaintiff was a union representative, or the like, when he spoke about alleged

differences in pay and benefits for minorities.  Moreover, there is no credible

evidence that defendants were aware of his discussions with the City Council or that they retaliated against him as a direct result of the speech. Given the speculative nature of plaintiff's testimony and the lack of any concrete substantive evidence, plaintiff's allegedly protected speech on behalf of other City employees is simply too tenuous to fulfill the public concern requirement.

With regard to the filing by plaintiff of the EEOC complaint and 2002 and 2003 lawsuits against the City, there is nothing in the record to demonstrate that any of the filings are exceptional or materially distinguishable from discrimination lawsuits filed by other public employees. Furthermore, defendants' motion for summary judgment in the 2002 case was granted on the case's merits or lack thereof.[9] Plaintiff's 2003 police brutality case, filed by plaintiff as a private citizen, is also indistinguishable from similar lawsuits.[10] Allowing the mere filing of a lawsuit which alleges racial discrimination by a public employee to fulfill the public concern requirement without more would so dilute the rule as to render it meaningless.

As the Second Circuit has held, "retaliation against the airing of generally personal grievances is not brought within the protection of the First Amendment by 'the mere fact that one or two of [a public employee's] comments could be construed broadly to implicate matters of public concern.' " *Ruotolo*, 514

---

9. Plaintiff has an appeal pending before the Second Circuit in the 2002 case.

10. This Court granted in part defendants' summary judgment motion and denied it as to plaintiff's excessive force claim and defendants' qualified immunity defense. Defendants in that case have an appeal pending before the Second Circuit on the issue of whether they are entitled to qualified immunity.

F.3d at 190 (quoting *Ezekwo v. New York City Health & Hosp. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991)). Nor is a "generalized public interest in the fair or proper treatment of public employees . . . enough." *Id.* Given that plaintiff's complaints are of a personal nature, he has not met the public concern requirement and, accordingly, may not maintain his First Amendment retaliation claim.

### b. Due Process Claim

Defendants argue that in order to state a due process claim, plaintiff must first demonstrate the deprivation of a constitutionally protected property or liberty interest. Mem. in Supp. at p. 19; *Sutton v. Village of Valley Stream*, 96 F.Supp.2d 189, 193 (E.D.N.Y. 2000). Defendants also note that defendant Eaton, pursuant to New York's Civil Service Law § 61(1), was authorized to appoint any one of the three candidates with the highest standing on the list. As a result, they contend that plaintiff had no legitimate claim of entitlement to the position and, consequently, his due process claim must fail.

Defendants also correctly note that plaintiff makes no arguments in support of his due process claim. Assuming that plaintiff intended to state a due process deprivation claim, defendants' motion for summary judgment is granted because plaintiff failed to establish that he was entitled to be appointed to the Animal Warden position. Accordingly, defendants' alleged failure to timely appoint plaintiff does not violate the due process clause. *See Sutton*, 96 F.Supp.2d at 194 ("The creation of a property right to the terms of one's public employment must be based upon more than an 'abstract need or desire,' there must be a

'legitimate claim of entitlement . . .' ") (quoting *Morris,* 196 F.3d at 115).

### c.    *Equal Protection Claim*

"The central purpose of the Equal Protection Clause of the

Fourteenth Amendment is the prevention of official conduct discriminating on the

basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976).  This Clause, part

of the Fourteenth Amendment is " 'essentially a direction that all persons

similarly situated should be treated alike.' "  *Diesel v. Town of Lewisboro*, 232

F.3d 92, 103 (2d Cir. 2000) (quoting *City of Cleburne v. Cleburne Living Ctr.,*

*Inc*., 473 U.S. 432, 439 (1985); *Latrieste Restaurant v. Village of Port Chester*,

188 F.3d 65, 69 (2d Cir. 1999)).

"Proof of racially discriminatory intent or purpose is required to

show a violation of the Equal Protection Clause."  *Village of Arlington Heights v.*

*Metropolitan Housing Development Corp*., 429 U.S. 252, 265 (1977).  *See*

*Washington*, 426 U.S. at 242 ("Disproportionate impact is not irrelevant, but it is

not the sole touchstone of an invidious racial discrimination.").  To state an Equal

Protection claim, a plaintiff must demonstrate that: (1) he, when compared with

others similarly situated, was treated differently; and (2) that the differential

treatment was based on impermissible considerations such as "race, religion,

intent to inhibit or punish the exercise of constitutional rights, or malicious or bad

faith intent to injure a person."  *Diesel*, 232 F.3d at 103 (citing *LeClair v.*

*Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)).  "To be 'similarly situated, the

individuals with whom plaintiff attempts to compare himself must be similarly

situated in all material respects' and have 'engaged in comparable conduct.' "
*Paola v. Spada*, 498 F.Supp.2d 502, 511 (D. Conn. 2007) (quoting *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)). *See Paola*, 498 F.Supp.2d at 512 (granting summary judgment on plaintiff's equal protection claim where plaintiff failed to proffer any individuals who were similarly situated); *Everson v. Lantz*, 453 F.Supp.2d 578, 583 (D. Conn. 2006) ("A plaintiff must demonstrate that an employee with whom he seeks to be compared is 'similarly situated in all material respects.' ") (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). "Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham*, 230 F.3d at 40. "A court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation, however, where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citing *Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)).

In support of his equal protection claim, plaintiff argues that he was treated differently from other similarly situated non-African-American Animal Wardens: (1) by having to take a civil service test to be appointed Animal Warden although former non-African American Animal Wardens did not take a such an exam; (2) former Animal Wardens were allowed to take the Shelter

vehicle home in addition to the police radio; (3) all previous Animal Wardens had the authority and responsibility for the job functions of which plaintiff was relieved; and (4) no other Animal Warden was scrutinized by the police department to nearly the same degree as plaintiff. Plaintiff also argues that defendants aided in perpetrating a hostile work environment by ignoring plaintiff's allegations of racial harassment and assault by defendant Bodah and by giving Bodah supervisory authority. Mem. in Opp. at p. 22-23; Plt. 56.1 Stmt. ¶¶ 18-25.

The problem with plaintiff's equal protection claim, however, is that there is no actual evidence that any comparator was sufficiently similar to plaintiff for comparison purposes. For instance, in support of his allegation that no other Animal Warden had to take a civil service examination, plaintiff offers his testimony that "Joe Palazzo . . . told Plaintiff that none of the other Animal Wardens had to take a civil service test to be appointed to the position." Plt. 56.1 Stmt. ¶ 19. Likewise, plaintiff offers only his testimony as proof for the rest of his contentions regarding disparate treatment which amounts to clearly inadmissible hearsay and will not be considered by the Court. Furthermore, plaintiff does not even attempt to compare the factual situations between him and his alleged comparators. "Generally, whether parties are similarly situated is a fact-intensive inquiry." *Clubside, Inc*., 468 F.3d at 159. In any event, the alleged comparators were employed by the City at different times under the direction of different City officials and different policies. Mem. in Supp. at p. 20.

Consequently, the Court holds that plaintiff's equal protection claim fails as a matter of law because he has not established that he was similarly situated in any, much less all, material respects to the former Animal Wardens, including establishing that they had the same job performance history and disciplinary problems as plaintiff. Defendants' motion for summary judgment on plaintiff's Equal Protection claim is hereby granted.

### d.    *Conspiracy Claim*

"To prove a § 1983 conspiracy claim, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citing *Carson v. Lewis*, 35 F. Supp.2d 250, 271 (E.D.N.Y. 1999). Although complaints containing "only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; [and] '[d]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct,' " *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993) (quoting *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1972)), the Second Circuit has held that conspiracies, by their nature, are covert and may have to be proven by circumstantial, rather than direct, evidence. *Pangburn*, 200 F.3d at 72 (citing *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994)).

Pursuant to the doctrine of intracorporate conspiracy, however,

"officers, agents and employees of a single corporate entity are legally incapable of conspiring together when acting within the scope of their employment." *Bhatia v. Yale University*, No. 06-CV-1769, 2007 WL 2904205, at *2 (D. Conn. Sept. 30, 2007) (citing *Tardd v. Brookhaven National Lab.*, 497 F. Supp.2d 404, 414 (E.D.N.Y. 2006)); *Cruz v. Reilly*, No. 08-CV-1245, 2009 WL 2567990, at *6 (E.D.N.Y. Aug. 18, 2009) (citing *Hermann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978)); *Nassau County Employee "L" v. County of Nassau*, 345 F. Supp.2d 293, 304 (E.D.N.Y 2004). The doctrine includes allegations of conspiratorial conduct between a public entity and its employees. *Quinn v. Nassau County Police Department*, 53 F. Supp.2d 347, 360 (E.D.N.Y. 1999).

An exception to the intracorporate conspiracy doctrine "applies to individuals within a single entity when they are pursing interests wholly separate and apart from the entity." *County of Nassau*, 345 F. Supp.2d at 304. As a result, "the doctrine's applicability depends on whether the individual defendants were acting within the scope of their official duties or pursuing their independent personal interests." *Id.* at 305. *See Bhatia*, 2007 WL 2904205, at *2 ("An exception applies where the plaintiff can demonstrate the employees were acting in their personal interests, wholly and separately from the corporation."); *Little v. City of New York*, 487 F. Supp.2d 426, 441-42 (S.D.N.Y. 2007) (dismissing conspiracy claims brought pursuant to 42 U.S.C. §§ 1983 and 1985(3) because plaintiff failed to provide "any evidence to suggest that either of the officers were motivated by an independent personal stake in his arrest and prosecution").

Turning to plaintiff's § 1983 conspiracy claim,[11] he argues that defendants Bodah, Eaton and Piazza had an agreement to deprive him of his free speech rights and to equal protection of the law in retaliation for plaintiff's exercise of his right to oppose racial discrimination. Plaintiff contends that Bodah, Eaton and Piazza took steps to create false allegations against plaintiff, removed all vestiges of his authority as Animal Warden and either participated directly in the racial harassment of plaintiff or granted Bodah increased authority and power over plaintiff. Plaintiff also argues that the intracorporate conspiracy doctrine does not apply because defendants were acting independently for their own retaliatory purposes.

As defendants note, however, a plaintiff alleging a claim pursuant to § 1983 must allege a violation of a federal right because § 1983 "provides a mechanism for enforcing individual rights "secured" elsewhere, *i.e.*, rights independently "secured by the Constitution and laws" of the United States." *Gonzaga University v. Doe*, 536 U.S. 273, 285 (2002). " '[O]ne cannot go into court and claim a 'violation of § 1983' for § 1983 by itself does not protect anyone against anything.' " *Id*. (quoting *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 617 (1979)). *See Chapman*, 441 U.S. at 618 ("Standing alone, § 1983 clearly provides no protection for civil rights since . . .

---

11. Plaintiff's complaint alleges a conspiracy pursuant to 42 U.S.C. § 1983 (Compl. ¶¶ 85-89) while his memorandum in opposition argues that plaintiff has established a 42 U.S.C. § 1985 conspiracy. The Supreme Court has held that § 1985(3) applies to private conspiracies. *See Griffin v. Breckenridge*, 403 U.S. 88, 104 (1971). Having already determined that there is state action in this case, plaintiff's conspiracy claim will be analyzed as one brought pursuant to § 1983 as alleged in his complaint.

§1983 does not provide any substantive rights at all."). The undersigned, having found that defendants did not deprive plaintiff of a federal constitutional right, may not now hold that defendants conspired to violate plaintiff's rights pursuant to § 1983.

The intracorporate conspiracy doctrine also bars plaintiff's claim despite plaintiff's attempt to demonstrate that defendants had a personal stake in retaliating against plaintiff and were acting outside the scope of their employment. With regard to Eaton, he was in charge of overseeing the City's various departments. It cannot seriously be disputed that a manager may rescind or alter an employee's duties as long as the reason for doing so is legitimate and non-discriminatory. While Bodah's work place conduct may have been heinous at times, her actions simply do not demonstrate that she was acting outside the scope of her employment to conspire against plaintiff with Eaton and Piazza. Nor is there any evidence that Piazza acted outside the scope of his employment for the purpose of aiding Eaton in retaliating against plaintiff. Accordingly, the intracorporate conspiracy doctrine bars plaintiff's conspiracy claim.

Furthermore, the Court is again constrained to note that Eaton, despite his status as a defendant in the 2002 litigation and despite the fact that he could have appointed one of two other individuals, appointed plaintiff to his permanent position while obviously fully aware of plaintiff's race. Bodah, also fully aware of plaintiff's race, wrote to the City Council in 2004 to express her appreciation for their making plaintiff acting Shelter warden and her hopes that

someday his position would become permanent.  Dec. Ciulla, Exh. Y.  Plaintiff's

claim that Piazza was aiding defendant Eaton and former City Manager Laffey

(who is not a defendant in this case) to retaliate against plaintiff is wholly

unsubstantiated.  On the other hand, the Court has already held that the City set

forth legitimate business reasons which were neither discriminatory nor retaliatory

for their decisions with regard to diminishing plaintiff's duties.  In fact, far from

conspiring to "get" plaintiff, it appears Eaton, as City Manager, wanted to put an

end to the problems caused by plaintiff's poor work habits as quickly and

seamlessly as possible without actually firing plaintiff.  Additionally and as

aforesaid, with regard to Bodah, she and plaintiff clearly did not see eye-to-eye

and their relationship became one of co-worker animosity and disapproval by

Bodah of the way plaintiff ran the Shelter.  For all of the foregoing reasons,

defendants' motion for summary judgment on plaintiff's § 1983 conspiracy claim

is hereby granted.

### e.    *Municipal Liability*

Pursuant to *Monell v. Dep't of Social Services of City of New York*,

436 U.S. 658, 692 (1978), 42 U.S.C. § 1983 imposes liability on "a government

that, under color of some official policy, "causes" an employee to violate

another's constitutional rights."  To state a claim against a policymaking

employer, a plaintiff must allege and prove that the employer had a custom or

policy of having its employees engage in violations of another's rights.  A

municipality's custom or policy may be established by, *inter alia*, demonstrating

that its "practice, as opposed to its formal policy, is to engage in . . . constitutional violation[s]." *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 125-26 (2d Cir. 2002)).

Additionally, municipal liability will be found where the discriminatory practices of officials "are persistent and widespread [so that] they 'could be so permanent and well settled as to constitute a "custom or usage" with the force of law.' " *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992) (quoting *Monell*, 436 U.S. at 691). "However, before the actions of subordinate city employees can give rise to § 1983 liability, their discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Id.* at 871.

Plaintiff argues that defendant Eaton, as City Manager, was clearly a policy maker and was the final authority on granting approval for the hiring and firing of employees; installing new policies and procedures; and granting supervisory authority with respect to the Shelter and all City Departments.

In the first instance, there is no evidence that Eaton created a "policy" by diminishing plaintiff's duties. Rather, one who is charge of a group of employees may alter an employee's job duties, particularly when they do not amount to adverse material changes made with a discriminatory purpose or intent. In any event, there is no evidence in this record that Eaton altered plaintiff's job duties with either.

Moreover, having found that defendants did not violate plaintiff's constitutional rights, there is simply no basis on which to hold the City liable on the theory that it caused its employees to violate plaintiff's civil rights. Defendants' motion is, therefore, granted on plaintiff's *Monell* claim.

### 4. Plaintiff's NYSHRL Claim

Plaintiff's discrimination and retaliation claims brought pursuant to New York law "are governed by the same standards as [his] federal claim." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993); *see also Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1048 (2d Cir. 1992) ("As the Supreme Court has noted, 'the elements of a successful employment discrimination claim' under Executive Law § 296 and Title VII are 'virtually identical,' such that a finding against a plaintiff on the state claim precludes a finding for the plaintiff on the federal claim. In light of New York's wholesale adoption of federal standards in discrimination cases under Executive Law § 296 claims, we find that the converse is also true.") (quoting *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 479-80 (1982)); *see Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000); *Torres v. Pisano*, 116 F.3d 625, 629 n.6 (2d Cir. 1997); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714-15 n.6 (2d Cir. 1996).

Given the Court's holding, *supra*, and its dismissal of plaintiff's Title VII claim, the same result is appropriate as to plaintiff's New York Executive Law § 296 claim. Accordingly, defendants' motion for summary judgment on this claim is hereby granted.

### III. CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment is hereby **GRANTED** in its entirety. Accordingly, plaintiff's complaint is hereby dismissed, including his request for attorney's fees and a declaratory judgment, and the Clerk of the Court is hereby directed to close this case.

**SO ORDERED.**

Dated: December 28, 2010
        Central Islip, New York

_____/s/_____
Thomas C. Platt, U.S.D.J.